# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

IN THE MATTER OF THE EXTRADITION OF )
)
FERNANDO GAMBOA HOWARD ) Case No. 2:15-mj-00627-NJK
)
AKA OSVALDO RICARDO ROMANDIA ) ORDER FOR CERTIFICATION
) OF EXTRADITION
)

The United States of America ("United States"), on behalf of the United Mexican States ("Mexico"), has requested the extradition of Fernando Gamboa Howard, a.k.a. Osvaldo Ricardo Romandia, pursuant to the Extradition Treaty between the United States and Mexico , signed at Mexico City on May 4, 1978 ("Extradition Treaty"), and entered into force January 25, 1980. *See* T.I.A.S. No. 9656, 31 U.S.T. 5059, 1980 WL 309106 (Jan. 25, 1980). Gamboa Howard is charged in the State of Baja California, Mexico, with Aggravated Homicide, for which a Mexican court issued a warrant authorizing his arrest. Gamboa Howard opposes the extradition request. Alternatively, he moves to stay this court's ruling on the extradition request so that he may pursue challenges to the Mexican warrant in a Mexican court.[1]

The court has considered the extensive record compiled in this case, as well as the witness testimony and the legal arguments made by counsel during the May 22, 2017 extradition hearing. The

---

[1] If the Court denies his request to stay these proceedings, Gamboa Howard asks the Court to stay execution of its decision so that he can appeal it.

court finds that the United States has satisfied its burden under 18 U.S.C. § 3184 et seq., and established that Gamboa Howard is eligible to be extradited to Mexico. The Court further denies Gamboa Howard's request for a stay of this Court's ruling on the United States' extradition request pending the outcome of Gamboa Howard's *amparo* challenge in Mexico.

## BACKGROUND

On July 29, 2015, the United States, acting on behalf of Mexico, submitted a complaint for the arrest of Gamboa Howard with a view toward extraditing him to fulfill the United States' treaty obligation to Mexico. *See* Docket No. 1. The complaint alleges that an extradition treaty exists between the United States and Mexico. *Id*. at ¶ 2. The complaint further alleges that, in accordance with Articles 2 and 10 of the treaty, Mexico "has asked the United States through diplomatic channels for the ... arrest and extradition" of Gamboa Howard. *Id*. at ¶ 3. The complaint indicates that Gamboa Howard has been charged in the State of Baja California, Mexico, with "Aggravated Homicide, as described by Articles 14, Section I; 16, Sections II and III; 123; 126; 147; 148; 150; 151; and 248 of the Penal Code of Baja California." *Id*. at ¶ 4. The complaint states that, on May 2, 2001, the supervisory Judge Of Playa de Rosarito, Baja California, issued an arrest warrant for Gamboa Howard. *Id*. at ¶ 5. The compliant sets forth extensive factual allegations underlying the charge and the issuance of the warrant in Mexico. *Id*. at ¶ 6, pg. 3-7. The complaint also references the evidence in this case. *Id*. After reviewing the complaint, the Court determined the terms of the extradition treaty between the United States and Mexico and, because the requirements for arrest had been met, issued an arrest warrant. Docket Nos. 2, 3.

On August 3, 2015, the United States Marshal Service arrested Gamboa Howard. Docket No. 5. Following a requested continuance, on August 5, 2015, Gamboa Howard had his initial appearance and was advised of his rights, as well as the charges in the complaint. Docket No. 8. Additionally, the Federal Public Defender was appointed to represent him. Docket No. 10. A status, identity, detention, and scheduling hearing was set for August 13, 2015. Docket No. 11. This hearing was continued several times at the request of the parties. Docket Nos. 15. 17, 20, 22, 30. On November 17, 2015, the hearing proceeded. Docket No. 31. The Court stated it would issue a written order regarding identity and detention. *Id*. Further, the Court set a deadline for extradition briefing and set the extradition

hearing for February 2, 2016. *Id*. On November 19, 2015, based on the evidence presented at the hearing and the arguments of counsel, the Court found that probable cause exists to support the finding that Gamboa Howard is the same person charged with Aggravated Homicide by the Mexican authorities. Docket No. 33 at 1-3. Additionally, the Court ordered Gamboa Howard detained pending his extradition hearing. *Id*. at 4.[2]

The extradition hearing was continued several times, at the parties' request. Docket Nos. 42, 46, 48, 51, 53, 57, 60, 68, 73, 75, 79. Some of Gamboa Howard's requests for continuance were based upon his pending *amparo* action in Mexico, which he represented could nullify the instant extradition action. Eventually, the hearing was set for May 22, 2017. Docket No. 79. Gamboa Howard has made no argument that this matter was not expeditiously processed.

Having received the extradition documents, the Court now determines whether it is "sufficient to sustain the charge under the provisions of the proper treaty or convention." 18 U.S.C. § 3184. If the Court finds the evidence sufficient, it must "certify the same" to the United States Secretary of State, who decides whether to surrender the fugitive "according to the treaty." *Id*. The Court conducted a hearing under the provisions of 18 U.S.C. § 3184 on May 22, 2017. The United States offered eight exhibits. Gamboa Howard offered the expert testimony of Ignacio Pinto-Leon, as well as two exhibits. The United States filed a motion in limine to exclude Mr. Pinto-Leon's testimony. Docket No. 81. Both parties presented extensive arguments and supplemental post-hearing briefing, which included additional exhibits. Docket Nos. 91, 92, 93.

**STANDARDS**

1. Request for Extradition

Extradition from the United States is a diplomatic process initiated by a request from a foreign nation directly to the State Department, seeking the extradition of an individual. *Prasoprat v. Benov*, 421 F.3d 1009, 1012 (9th Cir. 2005). "The primary concern in an international extradition matter is to deliver the extraditee to the requesting nation." *In the Matter of Extradition of Nacif-Borge*, 829 F.Supp. 1210, 1213 (D.Nev. 1993). Extradition treaties create a binding obligation on the United States to

---

[2]Gamboa Howard did not contest the United States' request for detention.

surrender fugitives to its treaty partners once the fugitives are found to be extraditable. *See Wright v. Henkel*, 190 U.S. 40, 62 (1903). Foreign extraditions are *sui generis* in nature, neither civil nor criminal in nature, and set forth their own law. *See, e.g., Nacif-Borge*, 829 F.Supp. at 1213.

The extradition process is governed by 18 U.S.C. § 3184, which confers jurisdiction on "any justice or judge of the United States, or any magistrate judge authorized so to do by a court of the United States" to conduct an extradition hearing under the relevant extradition treaty between the United States and the requesting nation, and to issue a certification of extraditability to the Secretary of State. 18 U.S.C. § 3184; *Cornejo–Barreto v. Seifert*, 218 F.3d 1004, 1009 (9th Cir. 2000). The State Department, therefore, determines whether the requesting nation's request is within the scope of a treaty between that nation and the United States and, if so, a United States Attorney files a complaint in federal district court to obtain an arrest warrant for the fugitive. *Manta v. Chertoff*, 518 F.3d 1134, 1140 (9th Cir. 2008).

To obtain a certification of extraditability on behalf of a requesting state, the United States must demonstrate each of the following elements: (1) the court has jurisdiction to conduct the extradition proceeding; (2) the court has jurisdiction over the fugitive; (3) an extradition treaty is in full force and effect; (4) the crime is extraditable; and (5) there is probable cause to believe that the individual appearing before the court has committed the crimes alleged by the requesting nation. *See* 18 U.S.C. §§ 3184, 3190; *Santos v. Thomas*, 830 F.3d 987, 991 (9th Cir. 2016) (*en banc*) (internal citation omitted); *Manta*, 518 F.3d at 1140.

If the requirements are met, the extradition magistrate judge must certify the individual as extraditable to the United States Secretary of State and issue a warrant of commitment. 18 U.S.C. § 3184; *Blaxland v. Commonwealth Dir. of Pub. Prosecutions*, 323 F.3d 1198, 1208 (9th Cir. 2003). Once such a certification has been made, "it is the Secretary of State, representing the executive branch, who determines whether to surrender the fugitive." *Id.*; 18 U.S.C. § 3184. Extradition is a matter of foreign policy entirely within the discretion of the executive branch, and "the executive branch's ultimate decision on extradition may be based on a variety of grounds, ranging from individual circumstances, to foreign policy concerns, to political exigencies." *Blaxland*, 323 F.3d at 1208. Thus, the authority of the extradition magistrate judge is limited to the judicial determination required by 18 U.S.C. § 3184. In other words, the magistrate judge "has no discretionary decision to make." *Lopez-Smith v. Hood*, 121

F.3d 1322, 1326 (9th Cir. 1997). *See also Manta*, 518 F.3d at 1140.

An extradition court "exercises very limited authority in the overall process of extradition." *Vo v. Benov*, 447F.3d 1235, 1237 (9th Cir. 2006). The authority of a magistrate judge serving as an extradition judicial officer "is limited to determining an individual's eligibility to be extradited, which [s]he does by ascertaining whether a crime is an extraditable offense under the relevant treaty and whether probable cause exists to sustain the charge." *Id*. *See also Prasoprat v. Benov*, 421 F.3d 1009, 1014 (9th Cir.2005); *Blaxland*, 323 F.3d at 1208 (internal citation omitted).

"'Extradition treaties are to be liberally construed so as to effect their purpose, that is, to surrender fugitives for trial for their alleged offenses.'" *In re Extradition of Santos*, 795 F.Supp.2d 966, 970 (C.D.Ca. 2011) (quoting *Valentine v. United States ex rel. Neidecker*, 299 U.S. 5, 14 (1936)). "These treaties should be faithfully observed, and interpreted with a view to fulfill our just obligations to other powers, without sacrificing the legal or constitutional rights of the accused." *In re Mathison*, 974 F.Supp.2d at 1305 (internal citations omitted). As a result, an extradition treaty "should be construed more liberally than a criminal statute or the technical requirements of criminal procedure." *Id*. (quoting *Factor v. Laubenheimer*, 290 U.S. 276, 298 (1933)).

2. <u>Authentication and Admissibility</u>

The admissibility of evidence in extradition proceedings is governed by "the general extradition law of the United States and the provisions of the" Extradition Treaty. *Emami v. U.S. Dist. Ct.*, 834 F.2d 1444, 1450 (9th Cir. 1987). "The authentication requirements for documentary evidence are contained in 18 U.S.C. § 3190, which specifies that 'the certificate of the principal diplomatic or consular officer of the United States resident in such foreign country shall be proof that submitted documents are authenticated in the manner required.'" *Barapind v. Enomoto*, 400 F.3d 744, 748 (9th Cir. 2005) (*en banc*) (per curiam); *see Bingham v. Bradley*, 241 U.S. 511, 517 (1916) (holding that documentary evidence that was "properly authenticated in accordance with" the predecessor provision to section 3190 was "competent" and "sufficient" to establish probable cause).

The Extradition Treaty states that the documents "accompany[ing] the request for extradition, shall be received in evidence when: ... b) In the case of a request emanating from the United Mexican States, they are certified by the principle [sic] diplomatic or consular officer of the United States in

Mexico." Extradition Treaty, art. 10, § 6. The Extradition Treaty does not impose supplementary authentication requirements or any other requirements for the admissibility of documentary evidence.

The Federal Rules of Evidence do not apply in extradition hearings. *Then v. Melendez*, 92 F.3d 851, 855 (9th Cir.1996). Therefore, hearsay evidence is admissible, as are unsigned translations of a witness' statements and unsworn statements of absent witnesses, provided the evidence is properly authenticated and—as is true in this case—the governing extradition treaty does not require that witness statements be executed under oath. *See Barapind*, 400 F.3d at 748; *Then*, 92 F.3d at 855.

An extradition proceeding is not a trial of guilt or innocence. Rather, it resembles a preliminary hearing, though the court's determination need not even be based upon evidence that would be admissible at a preliminary hearing or in a grand jury proceeding in the United States. *Matter of Extradition of Mathison*, 974 F.Supp.2d 1296, 1305 (D.Or. 2013). Therefore, the person sought is not entitled to introduce evidence which merely supports a defense. Gamboa Howard may offer limited evidence to explain or clarify elements in the demanding nation's case against him. *Nacif-Borge*, 829 F.Supp. at 1219. Additionally, Gamboa Howard may introduce evidence to rebut probable cause. Sometimes it may be difficult to draw the distinction between what evidence is allowable and what evidence instead relates directly to a defense. However, the admission and evaluation of evidence in extradition proceedings is committed to the sound discretion of the court. *Collins v. Loisel*, 259 U.S. 309, 316 (1922); *Nacif-Borge*, 829 F.Supp. at 1219.

The United States' evidence was contained in various exhibits accompanied by certificates with ribbons and seals signed and certified in accordance with 18 U.S.C. § 3190. The certification stated that the documents were "properly and legally authenticated so as to entitle them to be received in evidence for similar purposes by the tribunals of the United Mexican States." The United States also presented official communications, transmitted via the diplomatic channel, between the Governments of Mexico and the United States. Accordingly, the government's evidence is admissible for the purpose of establishing probable cause.

Gamboa Howard presented the testimony of an expert witness, Ignacio Pinto-Leon. The United States filed a motion in limine to exclude Mr. Pinto-Leon's testimony, and objected at the hearing. The Court finds that Mr. Pinto-Leon's testimony was offered to explain and/or clarify the *amparo*

proceedings in Mexico. Therefore, the Court finds his testimony admissible and DENIES the United States' motion in limine. Docket No. 81.

3. Request for Stay

Gamboa Howard has asked this Court to stay proceedings pending ruling on his *amparo* proceeding in Mexico.[3] Amparo means "protection" in Spanish, and is a proceeding created under the Mexican Constitution to protect individuals against state abuses by empowering Mexican federal courts to review government action. *United States v. Fowlie*, 24 F.3d 1059, 1064 (9th Cir.1994). It is a "highly complex legal institution," and is the procedural vehicle used to "review and annul unconstitutional judicial decisions." *Id*.

The Court must consider four factors in determining whether to grant a stay: "(1) whether the moving party has made a strong showing that it is likely to succeed on the merits; (2) whether the moving party will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injury the other parties interested in the proceeding; and (4) where the public interest lies." *In re Mathison*, 974 F.Supp.2d at 1305 (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)). A stay is an exercise of judicial discretion; therefore, the party who requests the stay bears the burden of showing that the circumstances of the particular case justify the court exercising its discretion in that manner. *Nken v. Holder*, 556 U.S. 418, 433–434 (2009).

The first two factors of the test "are the most critical." *Nken*, 556 U.S. at 434. Nontheless, a stay cannot issue unless the moving party meets its burden on the second factor, irreparable harm. *Leiva–Perez v. Holder*, 640 F.3d 962, 965 (9th Cir. 2011) (irreparable harm is "the bedrock requirement" to obtaining a stay). This is true "regardless of [the moving party's] proof regarding the other stay factors." *Id*. The moving party's evidence must prove that irreparable harm "is probable if the stay is not granted." *Id*. at 968. A showing of a "'possibility of irreparable injury' fails to satisfy the second factor." *Nken*, 556 U.S. at 434–435. Further, the moving party must show that the irreparable harm is "specific to his or her case, as opposed to a reason that would apply equally well to all [others]

---

[3]In the alternative, if the Court declines to stay the proceedings, Gamboa Howard asks the Court to stay its certification for two weeks so that he may file an appeal.

7

in all cases." *Leiva–Perez*, 640 F.3d at 969.

# DISCUSSION

1.   Motion to Stay Proceedings

Gamboa Howard submits that the extradition request is currently stayed in Mexico, and asks this Court to do the same. Docket No. 92 at 18. He submits that, if he is extradited, his *amparo* challenge to extradition "would be for naught," and he would therefore suffer irreparable harm. *Id*. at 19.

Gamboa Howard, however, must demonstrate individualized harm in order to meet the test for a stay. *In re Mathison*, 974 F.Supp.2d at 1306. Put another way, he must show that he would be irreparably harmed by providing "a reason specific to his ... case, as opposed to a reason that would apply equally well to all [others] and all cases." *Leiva-Perez*, 640 F.3d at 969. Gamboa Howard has failed to do so; instead stating that he would suffer the same harm as anyone else who has a pending *amparo* proceeding if the Court proceeds with the extradition process. As Gamboa Howard has failed to make a specific showing of irreparable harm, the Court need not proceed further, and must deny his request for a stay of proceedings. *See Fowlie*, 24 F.3d at 1065 (*amparo* decisions "had no bearing upon [fugitive's] rights under the United States-Mexican extradition treaty"); *Mathison*, 974 F.Supp.2d at 1310 (certifying fugitive as extraditable even though an *amparo* challenging the warrant underlying the extradition request was pending in Mexico); *In re Extradition of Salazar*, 2010 WL 2925444 (S.D.Cal. July 23, 2010) (certifying fugitive as extraditable where Mexican government supplemented extradition request with new warrant issued while extradition request pending in U.S. District Court after *amparo* court invalidated prior warrant).

2.   Extradition

Gamboa Howard does not dispute the following elements that must be demonstrated for extradition: that this Court has subject matter jurisdiction to conduct the extradition proceedings, that this Court has personal jurisdiction over Gamboa Howard, and that the crime is of aggravated homicide is extraditable. Docket No. 92 at 8. Further, although Gamboa Howard agrees that an extradition treaty between the United States and Mexico is in full force and effect and has been so during all relevant periods, he "asserts [that] the extradition request does not meet the terms of that extradition treaty." *Id*. Specifically, Gamboa Howard relies upon the warrant requirement of the treaty, and submits that the

extradition request is "based on a 2001 warrant that has been invalidated and vacated, thus failing to meet the treaty's warrant requirement." *Id*. at 9. Finally, in regard to the final prong, Gamboa Howard submits that the United States has failed to establish probable cause to believe that he committed the crime of aggravated homicide. *Id*.

### A. Court's Jurisdiction to Conduct Extradition Proceeding

The Court possesses subject matter jurisdiction to conduct extradition proceedings pursuant to 18 U.S. C. § 3184. Gamboa Howard agrees that this Court has jurisdiction to conduct the instant extradition proceeding.

### B. Court's Jurisdiction over Gamboa Howard

The Court possesses personal jurisdiction over Gamboa Howard. At all times material to this extradition proceeding, Gamboa Howard was present within the District of Nevada. Further, Gamboa Howard agrees that this Court has personal jurisdiction over him.

### C. Valid Extradition Treaty in Full Force and Effect

A valid extradition treaty exists between the United States and Mexico. This treat is, and has been at all times material to this proceeding, in full force and effect. Gamboa Howard agrees that the treaty exists and is in full force and effect. However, Gamboa Howard disputes whether the United States has complied with the treaty, in that he submits that his first *amparo* proceeding invalidated the warrant named in the complaint and that his second *amparo* proceeding purports to invalidate the currently-valid capture warrant, which is not named in the complaint.

In support of his argument, Gamboa Howard presented an expert at the hearing, Mr. Pinto-Leon, to testify about the *amparo* proceedings in Mexico and their impact on the warrants in this case. The Court finds Mr. Pinto-Leon may testify as an expert, and his testimony is admissible.

According to Mr. Pinto-Leon's testimony, on May 2, 2001, the Court of First Instance of Playas de Rosarito, in Baja California, Mexico issued a re-apprehension warrant for Gamboa Howard. Docket No. 89 at 15. On September 15, 2014, Gamboa Howard filed an *amparo* proceeding against the 2001 re-apprehension order. *Id*. In May of 2015, an *amparo* court in Mexico found that the warrant had a technical error and nullified it. *Id*. at 16. A re-apprehension warrant is properly issued when a defendant fails to comply with his bond conditions. *Id*. In Gamboa Howard's case, however, he was erroneously

freed by personnel at the jail in which he was imprisoned. *Id*. Therefore, Mr. Pinto-Leon testified, as Gamboa Howard had not failed to comply with bond conditions, the re-apprehension warrant was improperly issued, which was the finding of the *amparo* court. Id at 16-17. The *amparo* court allowed the trial court to issue, instead, a capture warrant, which it did on October 16, 2016. *Id*. at 15-17. Mr. Pinto-Leon specifically testified that the issuance of the capture warrant was in compliance with the order of the *amparo* court. *Id*. at 17.

On February 23, 2017, Mr. Pinto-Leon testified, a new *amparo* was filed against the capture warrant. *Id*. That *amparo* remains open, and has not yet been decided. *Id*. at 18. In the *amparo* proceeding, Gamboa Howard has argued that the extradition request is improperly based on the re-apprehension warrant that is no longer valid, and that the capture warrant was not part of the extradition request. *Id*. at 19. Mr. Pinto-Leon further testified that, if Gamboa Howard were to be found in Mexico now, even while the *amparo* was pending, he would be detained on the capture warrant. *Id*. at 20-21.

The United States submits that a valid warrant for Gamboa Howard's arrest has existed continuously throughout this proceeding. Docket No. 91 at 8, n.9. Once the *amparo* court nullified the 2001 warrant for a technical reason, not due to a lack of probable cause, the 2016 warrant was issued. An authenticated copy of the 2016 warrant has been presented to the Court, accompanied by a certificate from the U.S. Ambassador to Mexico. Additionally, the Mexican government has transmitted a letter to the Department of State through the diplomatic channel, dated May 16, 2017, which confirms that the 2016 warrant is valid and executable. "An American extradition court is neither equipped nor empowered to interpret and apply the Mexican Constitution or to determine what rights it bestows upon individuals charged with violating Mexican criminal laws." *Mathison*, 974 F.Supp.2d at 1310. Further, where the extradition proceeding "is manifestly taken in good faith, a technical noncompliance with some formality of criminal procedure should not be allowed to stand in the way of a faithful discharge of our obligations." *In re Extradition of Basic*, 2012 WL 3067466 at *18 (E.D.Ky. July 27, 2012) (court found that requesting country satisfied treaty's warrant requirement despite the fact that no document presented bore formal title of warrant of arrest).

The Court finds that a valid warrant for Gamboa Howard's arrest existed at all times. The Court further finds that the warrant satisfies the treaty's warrant requirement. Accordingly, this element is

satisfied.

D. <u>Crime is Extraditable</u>

Gamboa Howard is charged with aggravated homicide in Mexico. Gamboa Howard agrees that this charge is extraditable under the treaty. Therefore, the Court finds that this element is satisfied.

E. <u>Probable Cause Exists</u>

An extradition court "does not weigh conflicting evidence and make factual determinations." *Quinn v. Robinson*, 783 F.2d 776, 815 (9th Cir. 1986). Rather, the extradition proceeding is "designed only to trigger the start of criminal proceedings against an accused; guilt remains to be determined in the courts of the demanding country." *Valencia v. Limbs*, 655 F.2d 195, 198 (9th Cir. 1981). The committing Court's function is merely to determine whether there is "any evidence warranting the finding that there was a reasonable ground to believe the accused guilty." *Fernandez v. Phillips*, 268 U.S. 311, 312 (1925). *See also Mirchandani v. United States*, 836 F.2d 1223, 1226 (9th Cir. 1988). "Generally, evidence that explains away or completely obliterates probable cause is the only evidence admissible at an extradition hearing, whereas evidence that merely controverts the existence of probable cause, or raises a defense, is not admissible." *Mathison*, 974 F.Supp.2d at 1313. (internal citation omitted). It is solely the province of the district court to assess the credibility of the witnesses presented at the extradition hearing and determine the weight to be given their testimony. *Quinn v. Robinson*, 783 F.2d 776, 815 (9th Cir.1986).

Probable cause exists when evidence is sufficient "to lead a person of reasonable caution to believe that an offense has been or is being committed by the person being arrested." *United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007) (internal citation omitted). Probable cause means a "fair probability," not certainty or even a preponderance of the evidence. *United States v. Gourde*, 440 F.3d 1065, 1069–71 (9th Cir. 2006) (*en banc*). Probable cause is "a fluid concept turning on the assessment of probabilities and the particular factual context not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232 (1983). Probable cause does not deal with hard certainties, but with probabilities. *Id*. at 241. "The probable-cause standard is incapable of precise definition or quantification into percentages because it deals with probabilities and depends on the totality of the circumstances." *Rodis v. City, County of San Francisco*, 558 F.3d 964, 969 (9th Cir.

2009) (internal citation omitted). *See also Brinegar v. United States*, 338 U.S. 160, 175 (1949) (probable cause deals with "probabilities" which are not technical, but factual and practical considerations of everyday life on which reasonable and prudent people, not legal technicians, act).

The rules of evidence, other than with respect to privilege, do not apply in extradition proceedings. *See* Fed.R.Evid. 1101(d)(3). *See also Emami v. U.S. Dist. Court for the N. Dist. Of Cal.*, 834 F.2d 1444, 1451 (9th Cir. 1987) ("In the Ninth Circuit it has been repeatedly held that hearsay evidence that would be inadmissible for other purposes is admissible in extradition proceedings"). The extradition court's findings are based almost entirely on affidavits, depositions, and other documentary evidence supplied by the requesting government. *See* 18 U.S.C. § 3190. *See also Then*, 92 F.3d at 855 ("usual rules of evidence are not applicable in [extradition] context"); *Choe v. Torres*, 525 F.3d 733, 740 (9th Cir. 2008) (properly certified and authenticated summary of evidence prepared by prosecutor may be considered as evidence even though defendant alleges it is unreliable); *Artukovic v. Rison*, 784 F.2d 1354, 1356 (9th Cir. 1986) ("unsworn hearsay statements contained in properly authenticated documents can constitute competent evidence to support a certificate of extradition"); *Zanazanian v. United States*, 729 F.2d 624, 627 (9th Cir. 1984) (police reports summarizing witness statements properly considered in determining probable cause in extradition case).

The Court finds that the evidence presented by the United States supports the conclusion of a fair probability that Gamboa Howard engaged in the alleged conduct which constitutes the crime of aggravated homicide in Mexico with which he is charged. Accordingly, it satisfies the probable cause standard. Entered into evidence is the sworn affidavit of the Mexican prosecutor, Itzel Garcia Galindo., which includes information about the charge, as well as a summary of the evidence supporting the charge. Government Exhibit 6. Attached to the affidavit are exhibits, including a September 9, 2000 factual complaint by Cuauhtemoc Sanchez Gomez; four separate reports of the Ministerial Police of the State of Baja California written on separate dates in September and October 2000; an October 17, 2000 ministerial statement of Fidel Juarez Benitez; an October 13, 2000 ministerial statement of Jose Carlos Alvarez Grimaldo; and an October 14, 2000 ministerial statement of Luis Cuauhtemoc Sanchez Gomez.

The evidence shows that Gamboa Howard was the neighbor of Luis Mario Sanchez Vega ("Vega"). On September 9, 2000, Vega's son, Luis Cuauhtemoc Sanchez Gomez filed a complaint

before the Public Prosecutor regarding the disappearance of his father. Sanchez Gomez stated that he had last seen Vega on September 8, 2000. Sanchez Gomez stated that Vega told him that he was being threatened by Gamboa Howard and Hector Islas Morales. Sanchez Gomez stated that Gamboa Howard wanted to acquire Vega's farm, which was adjacent to Gamboa Howard's ranch. As Vega had refused, Gamboa Howard had threatened to kill him. Additionally, Vega had filed complaints against Gamboa Howard's partner Hector Islas Morales for threatening him when he refused to sell or give his farm to Gamboa Howard and Morales. Galindo Affidavit, Exhibit 5.

On October 17, 2000, Fidel Juarez Benitez gave a certified ministerial statement, wherein he stated that he was employed as one of Gamboa Howard's security guards. Benitez stated that Vega's house was next to Gamboa Howard's house, and that Gamboa Howard wanted to take Vega's property. Benitez stated that Vega had started gathering signatures to defend his property. Benitez stated that Gamboa Howard told him that Vega was getting in the way, and that he needed him to be killed and for him to disappear. Benitez stated that Gamboa Howard promised him he would pay him for killing Vega, though he did not specify the amount of money. Benitez stated that he enlisted Bernardo Ramirez Soto and Jose Carlos Alvarez Grimaldo, who were also Gamboa Howard's employees, to help him murder Vega for Gamboa Howard. Benitez stated that, on September 8, 2000, operating on Gamboa Howard's orders, Soto and Grimaldo kidnapped Vega at gun point, and forced him into a truck. Soto beat Vega repeatedly with a pistol. They drove down the highway where, Benitez stated, they passed him and he saw that they had Vega with them. At one point, Benitez said, Soto forced Vega out of the truck, threw him to the ground, and then got back in the truck and ran over Vega. Benitez stated that Soto and Grimaldo then returned to where Benitez was and told him that they had killed Vega by running over him with the vehicle. Benitez stated that he made Soto and Grimaldo take him to the murder scene so he could confirm that Vega was dead and could thus inform Gamboa Howard and Hector Islas Morales that the job had been completed. On the way to the body, Benitez stated, the three men piced up two tires. Benitez stated that he placed one tire below Vega's body and one on top of him, poured gasoline over the body and the tires, and lit them all on fire. Benitez stated that he later met with Gamboa Howard, who gave him $100 United States Currency for murdering Vega, with the promise of more money later. Benitez was able to pick Gamboa Howard in a photo line-up. Galindo Affidavit, Exhibits

7 and 11.

Jose Carlos Alvarez Grimaldo gave a certified ministerial statement as well. He stated that he worked as a security guard on Gamboa Howard's ranch property. Grimaldo stated that three or four days before they killed Vega, his work colleague Soto asked Grimaldo to join him to kill Vega. Soto told Grimaldo that Benitez asked him to kill Vega, on orders from their bosses Gamboa Howard and Morales. On the day of the murder, Grimaldo stated, he got out of his vehicle and forced Vega into the back. He then took out a semi-automatic pistol, pointed it at Vega, and told him he would kill Vega if he moved. As they drove past Benitez, Soto signaled to him that they had Vega. Grimaldo stated that Soto started punching Vega with the gun in different areas of his body. Grimaldo stated that they stopped the vehicle in a desolate place, and Soto pulled Vega - whose clothes were already bloodstained - out of the vehicle. Grimaldo stated that Vega was not moving, but that he ran over Vega twice with the vehicle. Grimaldo stated that he and Soto returned to Benitez and then the three of them returned to the area where they had left Vega's body. When they arrived, Grimaldo stated, he noticed that Benitez had a can of gasoline. They picked up two tires and put them on Vega. Grimaldo stated that Beitez poured gasoline on Vega's body and set it on fire. Grimaldo stated that, when he left, he returned to Gamboa Howard's ranch. Galindo Affidavit, Exhibit 8.

On October 13, 2000, certain items were found along a stretch of road: human bone fragments, a belt buckle, metal tips from a pair of boots, a small decorative chain from Vega's jacket, and six keys that opened various properties belonging to Vega. Vega's son recognized many of these items as belonging to Vega. The coroner accurately state that the bones were Vega's due to the fire. Galindo Affidavit, Exhibits 9 and 10.

Gamboa Howard submits that Benitez refused to sign a document to indicate that he identified a picture of Gamboa Howard, because he did not want to affect anybody. Docket No. 92 at 20. Gamboa Howard further submits that no physical evidence exists that links him to the charged offense. *Id*. at 21. Finally, Gamboa Howard, for the first time, asks the Court to consider a letter from 2002 submitted by the co-defendant Hector Islas Morales. *Id*. at 22. The letter purports to claim that the statements of three witnesses were obtained under torture. *Id*. The Court finds that it cannot consider this letter, as it requires the Court to "weigh conflicting evidence and make factual determinations," which it may not

do. *See Quinn*, 783 F.2d at 815. Any such determinations properly lie before the Mexican court.

Gamboa Howard's challenges to extradition do not prevent the Court from finding probable cause exists to support the Mexican warrant, just as it would not prevent the Court from finding probable cause exists to support the warrant request submitted by a United States law enforcement agency. Accordingly, the court concludes that the Mexican warrant is supported by evidence that creates probable cause to believe that Gamboa Howard committed the crime with which he is charged in Mexico. *See United States v. Lopez*, 482 F.3d at 1072.

## **CONCLUSION**

Therefore, pursuant to 18 U.S.C. § 3184, and the above findings, this Court certifies the extradition of the fugitive, Fernando Gamboa Howard, a.k.a. Osvaldo Ricardo Romandia, to Mexico, on the offense for which extradition was requested. The Court further commits the fugitive to the custody of the United States Marshal pending further decision on extradition and surrender by the United States Secretary of State, pursuant to 18 U.S.C. § 3186.

The Court further orders that the Clerk of Court forward a certified copy of this Certification and Committal for Extradition, together with a copy of the evidence presented in this case, including the formal extradition documents received in evidence and any testimony received in this case, to the United States Secretary of State.

Additionally, for the reasons stated above, the United States' motion in limine, Docket No. 81, is hereby **DENIED**.

IT IS SO ORDERED.

DATED: July 3, 2017.

NANCY J. KOPPE
United States Magistrate Judge